UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

JIMMY SANTIAGO,

                             Plaintiff,

                    -against-

NANCY BERRYHILL, Acting Commissioner
of Social Security,

                          Defendant.

------------------------------------------------------------x

17-CV-5149 (LGS)(OTW)

**REPORT AND RECOMMENDATION**

      **ONA T. WANG, United States Magistrate Judge:**

TO THE HONORABLE LORNA G. SCHOFIELD, United States District Judge,

## I. Introduction

Plaintiff brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB"). Plaintiff has moved for summary judgment pursuant to Fed. R. Civ. P. 56 and the Commissioner has cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

For the reasons set forth below, I respectfully recommend that the Commissioner's motion (ECF 13) be granted and the Plaintiff's motion (ECF 11) be denied.

## II. Facts[1]

### A. Procedural Background

Plaintiff filed an application for DIB on September 12, 2013, alleging that he became disabled on June 15, 2013, due to anxiety and "seizures/epilepsy." (Tr. 13, 298-304, 320). His application was initially denied on November 19, 2013 (Tr. 13, 225). At the request of Plaintiff, a hearing was held on September 10, 2015 before administrative law judge ("ALJ") Seth Grossman. (Tr. 13, 181-212, 240-41). The ALJ issued a decision on February 12, 2016 finding that Plaintiff was not disabled. (Tr. 13-23). On May 9, 2017, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Tr. 1-4).

### B. Medical Background

#### 1. Treating Sources

##### a. Montefiore Medical Center, Emergency Room Visit Before Alleged Onset Date

On January 24, 2013, Plaintiff was admitted to the Emergency Room at Montefiore Medical Center with a "seizure flurry in [a] setting of very poor sleep (2-4 hrs/night) and possible med[ication] non-compliance." (Tr. 460). Dr. Matthew Robbins, a neurologist at Montefiore, noted that Plaintiff suffered at least four seizures in a 16 hour period and that Plaintiff had forgotten to take his medication the day before. (Tr. 470). Dr. Alex Kazos, an emergency medicine physician, found that Plaintiff had a post-seizure head injury and

---

[1] Only the facts relevant to the Court's review are set forth here. Plaintiff's medical history is contained in the administrative record that the Commissioner filed pursuant to 42 U.S.C. § 405(g) (*see* Administrative Record, dated September 3, 2017 (ECF 8) ("Tr.")).

hematoma[2] above his left eye and that he was confused. (Tr. 461, 467). A CT[3] head scan was conducted at the request of Dr. Kazos, which revealed soft tissue swelling overlying the left frontal bone. (Tr. 478). Plaintiff was discharged on January 25, 2013 and advised to follow up with a neurologist. (Tr. 460).

### b. Dr. Steven Pacia, Neurologist

Dr. Steven Pacia began treating Plaintiff on May 26, 2010. (Tr. 521). Dr. Pacia examined Plaintiff on that date at the Lenox Hill Hospital's Comprehensive Epilepsy Center. (Tr. 353). Plaintiff told Dr. Pacia that his seizures started in childhood and continued during his adolescent period, averaging about four seizures per year. (Tr. 353). Dr. Pacia noted that Plaintiff's last seizure had been a few days earlier, on May 22, 2010, and was witnessed by his family. (Tr. 353). Before this episode, Plaintiff had suffered two seizures in eleven years, one episode three years prior and another episode eight years before that. (Tr. 353). Plaintiff denied that he was sleep-deprived and asserted that he took his anti-seizure medication as directed and Xanax because his work was stressful. (Tr. 353).

On June 11, 2010, Plaintiff was admitted to Lenox Hill Hospital for "convulsions." (Tr. 354-55). Dr. Pacia examined Plaintiff and reported that his primary diagnosis was epilepsy and that his secondary diagnoses were anxiety and insomnia. (Tr. 354-55).

---

[2] A hematoma is "a localized collection of blood, usually clotted, in an organ, space, or tissue, usually due to a break in the wall of a blood vessel." *Dorland's Illustrated Medical Dictionary* 832 (32nd ed. 2012).

[3] A computed tomography ("CT") scan "combines a series of X-ray images taken from different angles around your body and uses computer processing to create cross-sectional images (slices) of the bones, blood vessels and soft tissues in your body." *See CT Scan*, Mayo Clinic (May 9, 2018), https://www.mayoclinic.org/tests-procedures/ct-scan/about/pac-20393675 (last visited August 6, 2018). *See also Dorland's* at 1935.

On July 8, 2013, Dr. Pacia completed a "Disability Claim Form" (Tr. 545-47). Dr. Pacia opined that the primary condition affecting Plaintiff's functional capacity was "primary generalized epilepsy," for which he had been hospitalized in the past. (Tr. 545). Dr. Pacia further indicated that Plaintiff's secondary diagnosis was "memory loss." (Tr. 545). Dr. Pacia noted that "Quantitative Neuropsychological Testing revealed deficits 'most prominently in aspects of verbal fluency, learning, and memory . . .'" Dr. Pacia further opined that since June 7, 2013, these deficits coupled with Plaintiff's seizure disorder "have rendered him unable to perform any employment." (Tr. 546). Dr. Pacia noted that he had not advised Plaintiff to stop working. (Tr. 545).

Dr. Pacia examined Plaintiff on January 13, 2014 and noted that Plaintiff had ongoing complaints of poor short-term memory. (Tr. 529). On July 14, 2014, Dr. Pacia performed an Electroencephalogram ("EEG")[4] on Plaintiff (Tr. 533-34). Dr. Pacia concluded that the results were abnormal and "indicative of diffuse cortical hyperexcitability that is consistent with [Plaintiff's] history of primary generalized epilepsy." (Tr. 533-34).

Dr. Pacia examined Plaintiff again on July 23, 2014, and again noted that Plaintiff reported "having [a] terrible time with his [short-term memory]." (Tr. 530). During this visit, Dr. Pacia also noted that Plaintiff complained of being "very anxious, [and] not sleeping well for [the] past two months." (Tr. 530). In response, Dr. Pacia started Plaintiff on 10 milligrams of

---

[4] An EEG is "a test that detects electrical activity in your brain using small, metal discs (electrodes) attached to your scalp." *See EEG*, Mayo Clinic (May 16, 2018), https://www.mayoclinic.org/tests-procedures/eeg/about/pac-20393875. *See also Dorland's* at 600.

Ambien because he was "very concerned about breakthrough seizures" and "fear[ed] that sleep deprivation will result in seizures." (Tr. 530).

Dr. Pacia and Dr. Steven Smith, an attending neurologist specializing in epilepsy at Lenox Hill Hospital, examined Plaintiff on January 21, 2015, during which Plaintiff reported that he could not "remember conversations he has had or what he ate for lunch yesterday" and that the Ambien "made him feel like a 'zombie.'" (Tr. 531). Plaintiff also reported that his long-term memory is "great" and was "improving." (Tr. 531). Dr. Smith recommended that Plaintiff continue with Zonisamide[5] and have a follow-up EEG in six months.

On January 28, 2015, Dr. Pacia completed a document entitled "Seizures Impairment Questionnaire." (Tr. 521-26). Dr. Pacia diagnosed Plaintiff with primary generalized epilepsy and a resulting memory impairment. (Tr. 521). Dr. Pacia noted that the frequency of Plaintiff's seizures was "variable [but] well controlled in recent months." (Tr. 522). According to Dr. Pacia, Plaintiff had experienced three seizure episodes since September 2010. (Tr. 522). Dr. Pacia noted that Plaintiff's seizures were caused by, among other things, stress and missed doses of medication. (T. 522). Dr. Pacia determined that Plaintiff experienced confusion, decreased responsiveness, aggression, and a short-term memory impairment following a seizure. (Tr. 522-23). Dr. Pacia also noted that Plaintiff had a history of injury and incontinence during a seizure. (Tr. 523). Dr. Pacia determined that Plaintiff could not work at heights or work with machines that required an "alert operator," and was unable to operate a motor vehicle. (Tr. 523-24). According to Dr. Pacia, Plaintiff's symptoms were severe enough to constantly interfere with his

---

[5]Zonisamide is "a sulfonamide that acts as an anticonvulsant, used as an adjunct in the treatment of partial seizures in adults; administered orally." *Dorland's* at 2095.

attention and concentration. (Tr. 524). Dr. Pacia opined that Plaintiff had a "permanent and lifelong condition that will require lifelong medication and monitoring with resulting permanent cognitive impairment." (Tr. 521). As a result, Dr. Pacia concluded that Plaintiff was incapable of performing even a "low stress" job. (Tr. 524).

In a letter dated January 28, 2015 addressed to "Whom It May Concern," Dr. Pacia noted that Plaintiff had short-term memory difficulties which "may result from a series of strong convulsions similar to those that [Plaintiff] suffered in January 2013." (Tr. 528). Dr. Pacia determined that Plaintiff's memory impairment can be attributed to "the combination of high dose antiepileptic medication" and an "organic memory impairment" resulting from his epileptic fits and subsequent head trauma. (Tr. 528). Dr. Pacia supported his diagnosis with the neuropsychological examination performed by Dr. Virginia de Sanctis on June 7, 2013. (Tr. 528). Dr. Pacia concluded that, since January 2013, Plaintiff did not possess "the cognitive capacity to perform the duties required to secure gainful employment," and that his condition was permanent. (Tr. 528).

On April 20, 2015, Plaintiff was examined by Melissa Russell, a nurse practitioner ("NP") at New York University's Comprehensive Epilepsy Center, under the supervision of Dr. Pacia. (Tr. 606-08). Plaintiff told NP Russell that he had recently experienced double vision that caused him to go to the ER and that he had missed two doses of his medication prior to this recent seizure. (Tr. 606). Plaintiff reported that he continued to have spasms in his arms and neck "intermittently throughout the day" since his seizure. (Tr. 606). Plaintiff also reported that he had short-term memory issues, as well as anxiety and trouble sleeping since losing his job. (Tr.

606). NP Russell found that Plaintiff was in no distress, was awake, alert, fully oriented, and his memory was "[i]ntact to recall." (Tr. 607).

On July 22, 2015, Dr. Pacia examined Plaintiff together with Dr. Priyanka Sabharwal, a Neurology Fellow at New York University's Comprehensive Epilepsy Center. (Tr. 608-610). Dr. Sabharwal indicated that Plaintiff's last seizure was in April 2015 after missing a dose of medication, and that Plaintiff "denies interval seizures but [is] having [a] terrible time with his short term memory." (Tr. 608). Dr. Sabharwal noted that Plaintiff reported heightened anxiety and sleeplessness for the past two months. (Tr. 608). Dr. Sabharwal wrote that Plaintiff "cannot remember conversations he has had or what he ate for lunch yesterday but [long-term memory] is fine." (Tr. 608). Dr. Sabharwal also wrote that Plaintiff reported "lots of stress in the family" because his mother and grandparents were ill. (Tr. 608). Dr. Pacia and Dr. Sabharwal ordered an EEG of Plaintiff. (Tr. 610, 613-14). The doctors reviewed the results and concluded that "this is an abnormal awake and drowsy EEG study" and "is consistent with a diagnosis of idiopathic generalized epilepsy." (Tr. 613-14).

### c. Dr. Virginia Ann de Sanctis, Psychologist

On June 7, 2013, at Dr. Pacia's request, Dr. Virginia Ann de Sanctis, a psychologist, examined Plaintiff and prepared a "Neuropsychology Consultation Report" as part of a comprehensive evaluation of Plaintiff's current cognitive and behavioral functioning. (Tr. 538-44). Plaintiff told Dr. de Sanctis that he had had epilepsy since he was an infant after receiving an electric shock at thirteen months old. (Tr. 538). He described the cluster of seizures he had in January 2013 and stated that he had not experienced cognitive difficulties before this incident. (Tr. 538). Plaintiff graduated high school and went to college and stated that he never had any

difficulties in school. (Tr. 539). Plaintiff told the doctor that in his free time, he enjoyed going to

the shooting range, and playing golf, tennis and basketball with his teenage son, of whom he

has joint custody. (Tr. 539). Plaintiff last worked as a facilities director at a school for 15 years,

but was suspended in May 2013 for alleged use of "'foul' language and inappropriate

touch[ing]" of another faculty member. (Tr. 539).

Dr. de Sanctis examined Plaintiff and assessed his generalized intellectual functioning,

finding "marked variability with scores ranging from impaired to high average" after testing

certain neuropsychological abilities. (Tr. 539). With respect to Plaintiff's learning and memory,

Dr. de Sanctis noted that Plaintiff's

> [l]earning of a 10-word list across four trials was in the impaired range. Although Mr. Santiago was able to encode a maximum of 6/10 words over 4 trials, his learning curve was somewhat irregular *(RBANS list Learning)*. He was unable to spontaneously recall any of the learned words after a delay (impaired performance). Recognition memory for the learned words when presented in a yes/no format was also well below expectations. Immediate recall of contextualized verbal information (story) was within expectations, although delayed recall for the information was impaired. In terms non-verbal memory, when asked to reproduce the complex figure he had copied after a 20 minute delay, performance was above average.

(Tr. 540). Regarding Plaintiff's attention, Dr. de Sanctis determined that Plaintiff's

> [i]mmediate span of attention was lower than expectations in the borderline range (5 digits forward). On more complex tasks involving working memory and mental tracking, his performance was similarly low (e.g., 3 digits backward; 3 digits sequenced). His performance on timed visual search and attention tasks was variable *(RBANS Coding* z = - 1.9, borderline range; *TMT-A* 35", WNL).

(Tr. 540).

Dr. de Sanctis summarized her conclusions as follows:

> Neuropsychological test results indicate that his level of verbal and non-verbal intellectual functioning is well preserved, with no evidence of any overt decline.

Within specific cognitive domains, test results indicated that most aspects of executive functioning (e.g., set-shifting, novel problem solving, cognitive flexibility, and abstract reasoning), fine motor speed and dexterity, visuospatial skills, and non-verbal learning and memory are well preserved. Mild relative weaknesses were noted in verbal attention, working memory, and confrontation naming. More significant weaknesses were seen in verbal initiation and fluency and verbal learning and memory. . . .

Overall, the current test findings validate concerns expressed by Mr. Santiago. The neuropsychological deficits identified, most prominently in aspects of verbal fluency, learning, and memory, with more minor difficulties in attention, working memory, and confrontation naming are most suggestive dominant hemisphere and frontal lobe pathology, relatively consistent with prior EEG findings. This pattern of scores is also commonly seen in many individuals with a longstanding history of primary generalized epilepsy. As a final note, elevated levels of stress, sleep problems, symptoms of anxiety and depression, as well as prescription drug use may be important contributing factors to consider as attention and working memory skills are particularly vulnerable to these factors.

(Tr. 541). Dr. de Sanctis recommended various strategies that Plaintiff could employ to alleviate his symptoms, including "psychotherapy, substance use rehabilitation, [and] improved sleep hygiene." (Tr. 541-42).

### d. Jacobi Medical Center, Emergency Room Visit

On April 14, 2015, Plaintiff went to the emergency room at Jacobi Medical Center in the Bronx after experiencing a seizure at home (Tr. 535). Plaintiff reported that he missed two doses of his medication before the seizure and that this was his first seizure in two years. (Tr. 535). Dr. Allison Ludwig, an internal medicine doctor at the hospital, noted that Plaintiff's epilepsy had previously been controlled by Zonisamide and Xanax. (Tr. 535). Dr. Ludwig ordered a CT of Plaintiff's head and an MRI[6] of his brain, neither of which showed any abnormalities. (Tr. 535-36). Plaintiff was discharged the next day. (Tr. 535-537).

---

[6] Magnetic resonance imaging ("MRI") is "a technique that uses a magnetic field and radio waves to create detailed images of the organs and tissues within your body." *See MRI*, Mayo Clinic

### e. Dr. Irina Shur, General Practitioner

Dr. Irina Shur, a general practitioner, examined Plaintiff as a new patient on May 8, 2015. (Tr. 572). Plaintiff told Dr. Shur he had epilepsy, herniated disks, memory loss, difficulty breathing when he exercised, and fatigue. (Tr. 575-76). Plaintiff was again examined by Dr. Shur on June 12, 2015, at which time Dr. Shur determined that Plaintiff suffered from chronic back pain as a result of a herniated lumbar disc[7] with radiculopathy,[8] anxiety, and epilepsy. (Tr. 565). Dr. Shur also diagnosed Plaintiff with "Generalized Anxiety Disorder," for which she prescribed Xanax. (Tr. 565, 569-70).

### 2. Consulting Sources

### a. Fredelyn Damari, Ph.D., Consulting Psychologist

On October 31, 2013, Fredelyn Damari, Ph.D., a psychologist at Industrial Medicine Associates, P.C., examined Plaintiff for a consultative "Psychiatric Evaluation." (Tr. 509-13). Plaintiff told Dr. Damari that he had joint custody of his 16-year old son, was a high school graduate, and had attended some college. (Tr. 509). He last worked as a facilities director for 14 years, but was discharged in January 2013 due to "memory loss and [an] inability to perform the duties of his job." (Tr. 509). Plaintiff reported suffering seven seizures on January 23, 2013, after taking Levaquin. (Tr. 509). Plaintiff stated that he had trouble concentrating, short and long-term memory problems, and difficulty learning new material. (Tr. 510). Plaintiff reported

---

(December 30, 2017), https://www.mayoclinic.org/tests-procedures/mri/about/pac-20384768 (last visited Aug. 13, 2018). *See also Dorland's* at 916.

[7] A herniated disc is the "protrusion of the nucleus pulposus or anulus fibrosus of an intervertebral disk, which may impinge on [spinal] nerve roots." *Dorland's* at 852.

[8] Radiculopathy is a disease of the nerve root. *Dorland's* at 1571.

being able to dress, bathe, and groom himself. (Tr. 511). Plaintiff told Dr. Damari that he no longer cooks because on two prior occasions, he left the stove on "and almost caused a fire." (Tr. 511). Plaintiff stated that he performed general housecleaning, and was able to manage money, drive, and use public transportation. (Tr. 511). Plaintiff stated that his hobbies included playing pool, watching movies, and "playing golf sometimes." (Tr. 511). Plaintiff reportedly spends his days cleaning the house, watching television, and worrying about finances and his future. (Tr. 512).

Dr. Damari examined Plaintiff and found that he was cooperative and his speech was normal. (Tr. 510). Dr. Damari opined that Plaintiff's thought processes were coherent and goal directed, his affect was regular, his mood was normal and tranquil, his senses were clear, and he was fully alert. (Tr. 511). Dr. Damari found that Plaintiff's attention and concentration were intact, but that his recent and remote memory skills were mildly impaired. (Tr. 511). According to Dr. Damari, Plaintiff's intellectual functioning was average, though his "general fund of information was somewhat limited." (Tr. 511). Dr. Damari noted that Plaintiff's insight and judgment were both "good." (Tr. 511).

Dr. Damari determined that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain a regular schedule, make appropriate decisions, and relate adequately with others. (Tr. 512). Dr. Damari opined that Plaintiff was mildly impaired in his abilities to maintain attention and concentration, and to learn new tasks. (Tr. 512). According to Dr. Damari, Plaintiff was moderately impaired in his abilities to perform complex tasks independently and appropriately deal with stress. (Tr. 512). Dr. Damari concluded that Plaintiff's prognosis was "fair," and that the evaluation results were

consistent with stress-related and cognitive problems, but that these did "not appear to be significant enough to interfere with [Plaintiff]'s ability to function on a daily basis." (Tr. 512).

### b. Dr. Marilee Mescon, Consulting Internal Medicine Doctor

On October 31, 2013, Dr. Marilee Mescon, an internist at Industrial Medicine Associates, P.C., examined Plaintiff at the request of New York State Division of Disability Determination and conducted a consultative "Neurologic Examination." (Tr. 515-18). Plaintiff told Dr. Mescon that he suffered from epilepsy as well as chronic back pain due to being struck by a car in 2011. (Tr. 515). Plaintiff stated that he was able to shop, shower, bathe, and dress, but had difficulty cooking because he would sometimes forget to turn off the stove. (Tr. 516). Plaintiff reportedly spent his time watching television, playing pool, and going to the movies and supermarket. (Tr. 516). Dr. Mescon examined Plaintiff's general appearance, gait and station, fine motor activity in his hands, spine, head, neck, cranial nerves, eyes, upper and lower extremities and senses (Tr. 516-17). The doctor concluded that Plaintiff had no limitations in his abilities to sit or stand, "but his capacity to climb, push, pull, or carry heavy objects [was] severely limited because of the seizure disorder." (Tr. 518). Dr. Mescon opined that Plaintiff could "never be in environments where he is exposed to heights," and "should never drive a motor vehicle or be around heavy machinery." (Tr. 518). Dr. Mescon concluded that Plaintiff's prognosis was "fair to poor." (Tr. 517).

### c. T. Harding, Ph.D., State Agency Psychological Consultant

On November 18, 2013, a state agency psychological consultant, identified in the record only as "T. Harding, Ph.D.," reviewed the evidence of record and completed a "Mental Residual Functional Capacity Assessment." (Tr. 220-24). Dr. Harding determined that Plaintiff could

"perform simple jobs." (Tr. 222). Dr. Harding found that Plaintiff was "not significantly limited" in his ability to remember, understand and carry out simple instructions, maintain a regular schedule, make simple decisions or work with others. (Tr. 220-21). Dr. Harding did, however, find that Plaintiff was "moderately limited" in his ability to understand, remember, and carry out detailed instructions, as well as in his ability to maintain attention and concentration for extended periods. (Tr. 221). Furthermore, Dr. Harding noted that Plaintiff was "moderately limited" in his "ability to complete a normal workday and workweek without interruption from psychologically based symptoms" and to "perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 221).

### C. Social Background

On October 21, 2013, Plaintiff completed a "Function Report" for the Social Security Administration. (Tr. 327-35). Plaintiff reported that, during the day, he would take his medication, speak on the phone with his doctors, lawyers, and mother, and watch television. (Tr. 328). Plaintiff stated that he suffered from insomnia, and that the "stress of not working" made it difficult for him to sleep. (Tr. 328). He lived alone, except that his son stayed with him 3-4 days per week. (Tr. 327). With respect to personal care, Plaintiff relied on reminders to take his medication. (Tr. 329-30). He could prepare meals, but typically did not cook because he would forget to turn off the stove. (Tr. 329). He would send his laundry out and stated that he would rarely clean, noting that migraine headaches restricted his ability to do chores. (Tr. 330). Plaintiff stated that he was able to go out alone, drive a car, and shop, though he reported being afraid to leave his house alone because he feared he would forget how to return. (Tr. 330-31). Plaintiff was able to pay bills, count change, and handle a savings account. (Tr.

331). His hobbies included playing golf, throwing darts, playing chess, and watching television. (Tr. 331). Plaintiff reported difficulty with maintaining family and social relationships, but stated that he speaks with his mother daily, uses Facebook to communicate with friends, and occasionally finds company to go to lunch or play pool. (Tr. 332).

Plaintiff stated that he had no problems lifting, walking, sitting, climbing stairs, kneeling, reaching, or using his hands. (Tr. 332-33). He noted that he was unable to "stand quickly," but that he was able to "stabilize quickly when [he did] stand." (Tr. 332). He would also have to occasionally hold on to the wall when squatting. (Tr. 333). With respect to speech, Plaintiff noted that his speech was slow, and that he would occasionally stutter. (Tr. 333). Plaintiff reported difficulties paying attention and remembering things. (Tr. 334-35). He stated that his mind is "playing catch-up" due to his seizures and resulting head trauma, but he reported that he could do "short tasks" and follow both written and spoken instructions. (Tr. 334). Plaintiff indicated that he had no problem getting along with people in authority. (Tr. 334). Plaintiff also reported suffering from anxiety and stress. (Tr. 335). He stated that his "main problems" were his memory and migraines. (Tr. 335).

### D. Proceedings Before the ALJ

Plaintiff appeared at the September 10, 2015 administrative hearing with an attorney. (Tr. 182-212). Plaintiff testified that he last worked as a facilities director at a private school in New York City for 15 years. (Tr. 185). After Plaintiff was "let go" from his job in 2013, he collected unemployment benefits. (Tr. 184-87). He stated that he was fired for using profanity, which he disputed. (Tr. 185-86). He testified that he was unable to work due to memory difficulties and two herniated discs in his back. (Tr. 189-90). Plaintiff reported that he had short-

term memory issues – for example, he would forget whether or not he had eaten anything earlier in the day. (Tr. 203). Plaintiff stated that he would set reminders on his phone for medication and doctors' appointments. (Tr. 202). He noted drowsiness and an upset stomach as side effects from his Zonisamide medication. (Tr. 203). He would lie down for 30-45 minutes each day after taking his medication. (Tr. 203). Plaintiff testified that he would watch a lot of television during the day. (Tr. 193). He stated that he also shoots pool with his son. (Tr. 198). Plaintiff testified that he is allowed to drive and has a driver's license, but that he rarely drives. (Tr. 208).

## III. Analysis

### A. Applicable Legal Principles

#### 1. Standard of Review

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support the determination or whether it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam); *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012); *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).[9] Moreover, the court cannot "affirm an administrative action on grounds different from those considered by the agency." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Burgess*, 537 F.3d at 128).

---

[9] The standards that must be met to receive supplemental security income benefits under Title XVI of the Social Security Act are the same as the standards that must be met in order to receive DIB under Title II of the statute. *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). Accordingly, cases addressing either claim are equally applicable to the issues before the Court.

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence. *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision," *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009). However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord Talavera*, 697 F.3d at 151. Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Selian*, 708 F.3d at 417 (citation omitted).

### 2. Determination of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to work must last twelve months). In addition, to obtain DIB, the claimant must have become disabled before the date on which he was last insured. *See* 42 U.S.C. §§ 416(i), 423(a); 20 C.F.R. §§ 404.130, 404.315; *McKinstry v. Astrue*, 511 Fed.Appx. 110, 111 (2d Cir. 2013) (summary order) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)).

The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be "of such severity" that the claimant cannot perform his previous work and "cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Whether such work is actually available in the area where the claimant resides is immaterial. 42 U.S.C. § 423(d)(2)(A).

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (internal quotation marks omitted)).

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations. 20 C.F.R. § 404.1520(a)(4)(i)—(v); *see Selian*, 708 F.3d at 417-18; *Talavera*, 697 F.3d at 151. The first step is a determination of whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If he is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). If he does, the inquiry at the third step is whether any of these impairments meet one of the Listings in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). To be found disabled based on a Listing, the claimant's medically determinable impairment must satisfy all of the criteria of the relevant Listing. 20 C.F.R. § 404.1525(c)(3); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Otts v. Comm'r of Soc. Sec.*, 249 Fed.Appx. 887, 888 (2d Cir. 2007). If the claimant meets a listing, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not meet any of the Listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform his past relevant work given his RFC. 20 C.F.R. § 404.1520(a)(4)(iv); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If he cannot, then the fifth step requires assessment of whether, given claimant's RFC, he can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). If he cannot, he will be found disabled. 20 C.F.R. § 404.1520(a)(4)(v).

RFC is defined as "the most [the claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a)(1). To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945."

*Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), (quoting Social Security Ruling

96-8p, 1996 WL 374184, at *1 (July 2, 1996)). The results of this assessment determine the

claimant's ability to perform the exertional demands[10] of sustained work which may be

categorized as sedentary, light, medium, heavy or very heavy. 20 C.F.R. § 404.1567; *see Schaal

v. Apfel*, 134 F.3d 496, 501 n.6 (2d Cir. 1998). This ability may then be found to be limited

further by non-exertional factors that restrict claimant's ability to work. *See Michaels v. Colvin*,

621 Fed.Appx. 35, 38 n.4 (2d Cir. 2015) (summary order); *Zabala v. Astrue*, 595 F.3d 402, 410

(2d Cir. 2010).

   The claimant bears the initial burden of proving disability with respect to the first four

steps. Once the claimant has satisfied this burden, the burden shifts to the Commissioner to

prove that the claimant's RFC allows the claimant to perform some work other than his past

work. *Selian*, 708 F.3d at 418; *Burgess*, 537 F.3d at 128; *Butts v. Barnhart*, 388 F.3d 377, 383 (2d

Cir. 2004), *amended in part on other grounds on reh'g*, 416 F.3d 101 (2d Cir. 2005).

   In some cases, the Commissioner can rely exclusively on the Medical-Vocational

Guidelines contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination

at the fifth step. *Butts*, 388 F.3d at 383. "The [Medical-Vocational Guidelines] take[ ] into

account the claimant's RFC in conjunction with the claimant's age, education and work

---

[10]Exertional limitations are those which "affect [plaintiff's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b). In contrast, non-exertional limitations are those which "affect only [plaintiff's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching. 20 C.F.R. § 404.1569a(c).

experience. Based on these factors, the [Medical-Vocational Guidelines] indicate[ ] whether the claimant can engage in any other substantial gainful work which exists in the national economy." *Pagan v. Colvin*, 15 Civ. 3117 (HBP), 2016 WL 5468331, at *9 (S.D.N.Y. Sept. 29, 2016) (quoting *Gray v. Chater*, 903 F. Supp. 293, 298 (N.D.N.Y. 1995) (internal quotation marks omitted; alterations in original)); *see Butts*, 388 F.3d at 383.

Exclusive reliance on the Medical-Vocational Guidelines is not appropriate where non-exertional limitations "significantly diminish [a claimant's] ability to work." *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986); *accord Butts*, 388 F.3d at 383 ("sole reliance on the [Medical Vocational Guidelines] may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform.") (citation omitted). "Significantly diminish" means an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Bapp*, 802 F.2d at 606; *accord Selian*, 708 F.3d at 421; *Zabala*, 595 F.3d at 411. When the ALJ finds that the non-exertional limitations significantly diminish a claimant's ability to work, then the Commissioner must introduce the testimony of a vocational expert or other similar evidence in order to prove "that jobs exist in the economy which the claimant can obtain and perform." *Butts*, 388 F.3d at 383-84 (internal quotation marks and citation omitted); *see also Heckler v. Campbell*, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

### 3. Treating Physician Rule

The "treating physician rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion.[11] A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 404.1527(c)(2); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *Diaz v. Shalala*, 59 F.3d 307, 313 n.6 (2d Cir. 1995); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Schisler*, 3 F.3d at 568; *Burris v. Chater*, 94 Civ. 8049 (SHS), 1996 WL 148345, at *4 n.3 (S.D.N.Y. Apr. 2, 1996). The Second Circuit has noted that it "'do[es] not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician['s] opinion.'" *Morgan v. Colvin*, 592 Fed.Appx. 49, 50 (2d Cir. 2015) (summary order) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)); *accord Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the amount of weight the opinion should be given. These factors include: (1) the length of the treatment relationship and the frequency of

---

[11] Although not relevant here, the Court notes that the regulations governing the "treating physician rule" recently changed as to claims filed on or after March 27, 2017. *See* 20 C.F.R. §§ 404.1527, 404.1520c; Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R. 5844-01, 2017 WL 168819, at *5844, *5867-68 (Jan. 18, 2017). *Accord Cortese v. Comm'r of Social Sec.*, 16 Civ. 4217 (RJS), 2017 WL 4311133, at *3 n.2 (S.D.N.Y. Sept. 27, 2017).

examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (c) (2)—(6); *Schisler*, 3 F.3d at 567; *Mitchell v. Astrue*, 07 Civ. 285 (JSR), 2009 WL 3096717, at *16 (S.D.N.Y. Sept. 28, 2009); *Matovic v. Chater*, 94 Civ. 2296 (LMM), 1996 WL 11791, at *4 (S.D.N.Y. Jan. 12, 1996). Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor. *Atwater v. Astrue*, 512 Fed.Appx. 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").

As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. *See Halloran*, 362 F.3d at 32-33; *see also Atwater*, 512 Fed.Appx. at 70; *Petrie v. Astrue*, 412 Fed.Appx. 401, 406-07 (2d Cir. 2011) (summary order); *Kennedy v. Astrue*, 343 Fed.Appx. 719, 721 (2d Cir. 2009) (summary order). "The opinions of examining physicians are not controlling if they are contradicted by substantial evidence, be that conflicting medical evidence or other evidence in the record." *Krull v. Colvin*, 669 Fed.Appx. 31, 32 (2d Cir. 2016) (summary order) (citation omitted); *see also Monroe v. Comm'r of Social Sec.*, 676 Fed.Appx. 5, 7 (2d Cir. 2017) (summary order). The ALJ is responsible for determining whether a claimant is "disabled" under the Act and need not credit a treating physician's determination to this effect where it is contradicted by the medical record. *See Wells v. Comm'r of Soc. Sec.*, 338 Fed.Appx. 64, 66 (2d Cir. 2009) (summary order). The ALJ may rely on a consultative opinion where it is

supported by substantial evidence in the record. *See Richardson*, 402 U.S. at 410; *Camille v. Colvin*, 652 Fed.Appx. 25, 27-28 (2d Cir. 2016) (summary order); *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995); *Mongeur*, 722 F.2d at 1039.

**B. The ALJ's Decision**

The ALJ applied the five-step analysis described above and determined that Plaintiff was not disabled. (Tr. 13-23).

As an initial matter, the ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2017. (Tr. 13).

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since the alleged onset date of June 15, 2013. (Tr. 15).

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: anxiety, depression, and seizures/epilepsy. (Tr. 15). The ALJ found that Plaintiff's herniated disc impairment and the resulting back pain were not severe, stating that:

> His recent physical exams showed some back and leg pain, but no spinal tenderness and the claimant had normal strength in all muscle groups and normal range of motion in all joints (16F/12, 14). The record contains no diagnostic imaging or testing suggesting that the claimant has any functional limitations due to his lower back pain. There is little evidence of treatment for this condition, despite frequent doctor's visits for the claimant's other impairments. Moreover, the claimant has not alleged any significant problems with exertional or postural activities (3E/6-7).

(Tr. 15-16).

At step three, the ALJ found that Plaintiff's disabilities did not meet or medically equal the criteria of any of the Listings and was therefore not entitled to a presumption of disability. (Tr. 16-17). In reaching his conclusion, the ALJ first considered Listings 11.02 and 11.03, finding

that "the evidence failed to document the required occurrence of seizures despite compliance with medication."

The ALJ next considered Listings 12.02, 12.04, and 12.06, with respect to Plaintiff's mental impairments, finding that neither the "paragraph B" nor "paragraph C" criteria, at least one of which is required to meet the Listings, was satisfied by the evidence. (Tr. 16). The ALJ determined that Plaintiff had mild restrictions in his daily living activities, mild difficulties in his social functioning, moderate difficulties with regard to concentration, persistence or pace, and no episodes of decompensation which have been of extended duration. (Tr. 16-17). Accordingly, the ALJ concluded that because Plaintiff's "mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." (Tr. 17). The ALJ also determined that the evidence similarly did not satisfy the "paragraph C" criteria for any of these Listings. (Tr. 17).

The ALJ then determined that Plaintiff retained the RFC to:

perform light work[12] as defined in 20 CFR 404.1567(b) except the claimant can perform a full range of simple task/instruction jobs, and a range of more complicated tasks/instruction jobs. The claimant must avoid working at heights or with dangerous equipment. For the above type jobs, the claimant can understand and carry out

---

[12] Pursuant to the Social Security Administration's regulations,

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

instructions, maintain attention and concentration, interact appropriately with others, and keep a regular schedule, all within normal work expectations. A strict limitation to simple task/instruction jobs would not change the outcome of this case; however, the evidence does not establish that the claimant is so limited.

(Tr. 17).

The ALJ also assessed Plaintiff's credibility by comparing Plaintiff's statements and testimony with the objective medical evidence. (Tr. 18-20). The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce his claimed symptoms, but that Plaintiff's statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (Tr. 18-20). For example, the ALJ pointed out that Plaintiff's performance on the Neuropsychological Consultation Report was varied, with results from borderline to average. (Tr. 19-20). The ALJ also found that Plaintiff's testimony regarding being able to drive and play pool both demonstrate that his concentration is not as limited as he claimed. (Tr. 20). The ALJ also noted that "the record demonstrates very little treatment for anxiety or depression," which detracted from the severity of those conditions. (Tr. 19). Additionally, the ALJ found that Plaintiff's receipt of unemployment benefits after his alleged onset date "detracts somewhat from his overall credibility." (Tr. 20). The ALJ also noted that Plaintiff's seizures were controlled with medication and that his recent episodes occurred when he neglected to take his medication. (Tr. 19-20, 353, 469, 535, 601).

To reach his RFC determination, the ALJ also reviewed the opinions of the treating and consulting physicians. (Tr. 20-21). The ALJ gave "significant weight" to the opinion of the state agency psychological consultant, T. Harding, Ph.D., that Plaintiff had moderate limitations to perform work-related activities and could perform simple jobs, because Dr. Harding's opinion

was "internally consistent and well supported by a reasonable explanation of the available evidence." (Tr. 20). The ALJ noted that, despite being a non-treating, non-examining medical source, Dr. Harding's opinion was "based on a thorough review of the available medical records and a comprehensive understanding of the agency rules and regulations." (Tr. 20).

The ALJ gave "good weight" to the opinion of the consulting psychological examiner, Fredelyn Damari, Ph.D., that Plaintiff could perform simple tasks and was moderately impaired in his ability to perform complex tasks, because it was "consistent with the claimant's allegations as well as the evidence contained in the record." (Tr. 20).

The ALJ gave "good weight" to consulting neurological examiner Dr. Mescon's opinion regarding Plaintiff's physical limitations in a work setting because the ALJ found Dr. Mescon's opinion to be "consistent with the claimant's treatment history and functional limitations." (Tr. 20-21).

Lastly, the ALJ gave "little weight" to Plaintiff's treating physician Dr. Pacia's opinion that Plaintiff had not possessed the cognitive capacity to perform gainful employment since January 2013 and was incapable of even simple tasks, stating:

> Although the claimant's cognitive limitations may prevent him from being employed at his previous positions, there is little, if any, testing contained in the record that would suggest he is incapable of simple tasks (9F/2-3, 1 lF/5, 13F/4, 16F/13). To the contrary, the detailed June 7, 2013 Neuropsychological Consultation Report discussed above shows the claimant is capable of more than simple task instruction jobs. (Exhibit 13F). Therefore, despite Dr. Pacia's treating relationship with the claimant, the undersigned gives his opinion little weight.

(Tr. 21).

At step four, the ALJ determined that Plaintiff was unable to perform his past relevant work. (Tr. 21).

At step five, the ALJ referred to the Medical-Vocational Guidelines, concluding that jobs existed in significant numbers in the national economy that Plaintiff could perform given his RFC, age, education, and work experience. (Tr. 21-22). The ALJ determined that Plaintiff could perform "all or substantially all of the exertional demands" of light work despite the limitations of the RFC findings. (Tr. 22). The ALJ noted that the sedentary and light unskilled jobs bases were only minimally affected by Plaintiff's non-exertional limitations, and thus Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 22). Accordingly, the ALJ found that Medical-Vocational Guideline Rule 202.14 directed a finding of "not disabled." (Tr. 22).

### C. Analysis of the ALJ's Decision

Plaintiff contends that the ALJ's decision should be overturned for the following reasons: (1) the ALJ failed to afford proper weight under the treating physician rule to Dr. Pacia's opinions and (2) the ALJ's evaluation at step three was inadequate or based upon an improper legal standard. (Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, dated December 11, 2017, (ECF 12) ("Pl. Mem.")). The Commissioner argues that the ALJ correctly applied the relevant legal principles and that his decision was supported by substantial evidence. (Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion, dated February 9, 2018, (ECF 14) ("Comm. Mem.")).

### 1. Treating Physician Rule

Plaintiff first argues that the ALJ erred in affording "little weight" to the opinions of treating physician Dr. Steven Pacia. Plaintiff contends that, contrary to the ALJ's findings, Dr.

Pacia's opinion regarding Plaintiff's mental and physical limitations was supported by the objective medical evidence and thus deserved "considerable weight." (Pl. Mem. at 10-12). The Commissioner argues that the ALJ was correct in finding that Dr. Pacia's opinions were inconsistent with substantial evidence of record, and that the ALJ properly evaluated the medical evidence in reaching this conclusion. (Comm. Mem. at 10-15).

Though the ALJ did not expressly address each factor relevant to evaluating a treating physician's opinion, he did provide good reasons for affording less weight to Dr. Pacia's opinion that Plaintiff did not have the cognitive capacity to do any work – namely that it was inconsistent with other substantial evidence, including the medical evidence and Plaintiff's own statements. The ALJ acknowledged that the evidence undoubtedly revealed cognitive deficiencies on the part of Plaintiff; however, substantial evidence supports the ALJ's finding that the objective medical evidence indicates that Plaintiff is at the very least capable of performing simple tasks and following simple instructions.

Dr. Pacia relied primarily on the report of Dr. Virginia de Sanctis for his conclusion that Plaintiff's memory impairment rendered him unable to work at all. (Tr. 521, 528). The conclusions in Dr. de Sanctis's report, however, does not support a finding that Plaintiff's cognitive impairments are so severe that he is incapable of performing even simple tasks or maintaining attention and concentration in such a work setting. In her Neuropsychology Consultation Report, Dr. de Sanctis found that Plaintiff had "more significant weaknesses" in memory performance with respect to verbal initiation, verbal fluency, verbal learning and memory. (Tr. 541). However, Dr. de Sanctis also found overall that the "test results indicate that his level of verbal and non-verbal intellectual functioning is well preserved, with no evidence of

any overt decline." (Tr. 541). She stated that "most aspects of [Plaintiff's] executive functioning (*e.g.*, set-shifting, novel problem solving, cognitive flexibility, and abstract reasoning), fine motor speed and dexterity, visuospatial skills, and non-verbal learning and memory [were] well preserved." (Tr. 541). She opined that Plaintiff had "mild relative weaknesses" in verbal attention and working memory. (Tr. 541). Although Dr. de Sanctis's findings support Dr. Pacia's conclusion that Plaintiff has a memory impairment that arose sometime after a series of seizures in January 2013, there is nothing in her conclusions that supports Dr. Pacia's opinion that Plaintiff is so cognitively impaired that his symptoms would "constantly" interfere with his attention and concentration and preclude him from even simple tasks.

The findings and opinions of consulting psychologist Dr. Damari also support the ALJ's RFC finding regarding Plaintiff's cognitive impairments. Dr. Damari tested Plaintiff and noted that Plaintiff's recent and remote memory skills were mildly impaired. (Tr. 511). Dr. Damari concluded that Plaintiff was "able to follow and understand simple directions and instructions" and "able to perform simple tasks independently." (Tr. 512). Dr. Damari found that Plaintiff had only mild impairments in his ability to maintain attention and concentration and learn new tasks. (Tr. 512). Although Dr. Damari concluded that Plaintiff had moderate limitations in his abilities to deal with stress and perform complex tasks independently, he concluded that these problems alone were not significant enough to interfere with Plaintiff's ability to maintain a regular schedule, make appropriate decisions, and relate adequately with others. (Tr. 512). Thus, Dr. Damari's examination findings and opinion supported the ALJ's RFC finding that Plaintiff could perform simple tasks.

Plaintiff's own statements corroborate these findings. Plaintiff indicated on a Function Report and at the hearing that he is able to drive, play golf, chess, and basketball, shoot pool, cook, and handle his finances. (Tr. 197-98, 330-32, 511, 516). Many of these activities require attention and concentration. Moreover, the treatment notes in the record indicate that although Plaintiff complained of short-term memory issues, he told his doctors that his long-term memory was intact. (Tr. 531, 608). Finally, as the ALJ found, despite complaints of memory issues and recommendations from Dr. de Sanctis that he seek treatment, there is no evidence in the record that Plaintiff sought treatment for his memory and cognitive difficulties. Rather, Plaintiff was able to maintain a schedule by setting up reminders on his phone to take care of his daily tasks. (Tr. 202, 309).

Plaintiff also argues that the ALJ should have given more weight to Dr. Pacia's opinion regarding Plaintiff's physical limitations. With respect to Plaintiff's physical impairments. Dr. Pacia opined that Plaintiff could not work at heights, operate machinery that requires an alert operator, or operate a motor vehicle (Tr. 523-26). Plaintiff argues that Dr. Pacia's opinion regarding Plaintiff's physical limitations is also supported by: (a) Dr. Mescon's opinion that plaintiff could not operate a vehicle or be around heavy machinery, or climb push or carry heavy objects (Pl. Mem. 12, citing Tr. 518), (b) NP Russell's treatment notes indicating that Plaintiff continued to have spasms in his upper extremities and neck throughout the day (Pl. Mem. 12, citing Tr. 548), and Dr. Damari's assessment that Plaintiff suffered from migraines and headaches and chronic and acute seizure disorders. (Pl. Mem. 12, citing Tr. 512).

The limitations described in Dr. Pacia's opinion and in the other treatment providers' notes cited by Plaintiff are consistent, however, with the ALJ's RFC finding that Plaintiff was

limited to light work and must avoid working at heights or with dangerous equipment. (Tr. 17). As to the opinion that Plaintiff could not handle heavy machinery or objects, the ALJ found that Plaintiff must "avoid working . . . with dangerous equipment" and limited Plaintiff to "light work," (Tr. 17), which does not require heavy lifting; rather, it requires lifting of weights up to twenty pounds, with frequent lifting or carrying of objects weighing up to ten pounds. 20 C.F.R. § 404.1567 (b). Moreover, although Dr. Pacia and Dr. Mescon opined that Plaintiff could not drive, Plaintiff himself told the Social Security Administration that he had a license and could drive. (Tr. 208, 330-31). As to NP Russell and Dr. Damari's assessments that Plaintiff continued to have symptoms related to his epilepsy, Plaintiff does not explain how these limitations affect Plaintiff's ability to maintain a regular work schedule or do work consistent with the ALJ's RFC finding. Indeed, the evidence indicates that the ALJ did consider Plaintiff's epilepsy in determining that he was limited to light work and must avoid working at heights or with dangerous equipment. (Tr. 17). Further, Plaintiff does not dispute that his epilepsy symptoms were controlled when he took his medication as directed, (Tr. 522), and that his recent seizure episodes were attributed to missed doses of anti-seizure medication. (Tr. 353, 469, 535, 601). Dr. Pacia also acknowledged in January 2015 that although Plaintiff's seizure frequency was "variable," Plaintiff was compliant with his medication regimen and that his seizures were "well-controlled in recent months." (Tr. 522-23).

The ALJ thereby adhered to the underlying principles of the treating physician rule by assessing more weight to the opinions in the record that were supported by the treatment notes, the diagnostic evidence and Plaintiff's own statements regarding his conditions. As a result, remand is not warranted for failure to give Dr. Pacia's opinions controlling weight.

### 2. ALJ's Analysis at Step Three: Listings

Plaintiff next argues that the ALJ's decision at step three was erroneous because the ALJ failed to assess whether his combined impairments medically equal a Listing, and that the ALJ was obligated to obtain medical expert testimony in order to make this determination. (Pl. Mem. at 12-13). The Commissioner argues that the ALJ was correct in his analysis and that Plaintiff's argument on this point is waived because Plaintiff does not assert that his conditions meet any particular Listing and it is unaccompanied by any analysis of the record. (Comm. Mem. at 15-16).

Plaintiff provides no analysis and cites to no part of the Record to support a finding that Plaintiff meets any Listing. The only Listing numbers even mentioned in Plaintiff's Memorandum are Listings 12.02, 12.04 and 12.06. (Pl. Mem. at 13). Thus, the Commissioner's contention that this issue is waived is persuasive. In any event, the ALJ's finding that "the severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.02, 12.04 and 12.06,"(Tr. 16) is supported by substantial evidence.

To meet any one of these Listings, Plaintiff's impairments must at least meet or medically equal either the paragraph B or C criteria in these Listings. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12. [13]

---

[13] These Listings were revised effective January 17, 2017. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 2016 WL 5341732 (Sept. 26, 2016) ("The prior rules will continue to apply until the effective date of these final rules."). The Court will evaluate the application of the Listings that were in effect at the time of the ALJ's decision.

The evidence in the record does not support a finding that Plaintiff's conditions meet or medically equal the "paragraph B" criteria for Listings 12.02, 12.04, or 12.06. Paragraph B of these Listings are identical and call for the presence of at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.02 ¶ B, § 12.04 ¶ B, § 12.06 ¶ B. A "marked" restriction or difficulty means more than moderate but less than extreme. 20 C.F.R. § Pt. 404, Subpt. P, App.1.

As to paragraph B(1), while Plaintiff notably has difficulty with his daily activities, the record fails to demonstrate that his impairments rise to the level of a marked restriction. In his Function Report, under the section entitled "Information About Your Daily Activities," Plaintiff checked a box indicating that he has "no problem with personal care," and stated that he is able to bathe, dress, clean, cook, and take his medication. (Tr. 328-329, 511). He also wrote that he is able to shop for food, clothing, and home products, though he stated that he prefers to go with his son. (Tr. 331). While Plaintiff expressed frustration with his current financial situation, he noted that he is able to pay his bills and handle a savings account. (Tr. 331). Plaintiff has a driver's license and is able to drive or use public transportation to get around. (Tr. 208, 330-31, 511). Though Plaintiff reports that he is often aided by reminders that he sets on his cell phone, this reliance does not result in a greater than moderate restriction in his daily activities. (Tr. 329). Thus, Plaintiff's own statements and the objective medical evidence discussed above suggest Plaintiff has only a mild restriction in daily functioning.

As to paragraph B(2), Plaintiff's difficulties in social functioning, Plaintiff suffers mild difficulties. Plaintiff states that he used to be a lot more social, often going out with others up to six times per week. (Tr. 332). While Plaintiff's social activity has diminished, the record suggests that Plaintiff's overall social functioning is intact. Plaintiff has shared custody of his son, reportedly seeing him three to four times per week. (Tr. 328, 331). Plaintiff reportedly ensures that his son is fed and his clothes are washed, and gets him ready for school in the morning. (Tr. 328). Together, Plaintiff and his son play golf, throw darts, and watch television or movies. (Tr. 331). Plaintiff also communicates with other family members daily, and uses social media to contact friends. (Tr. 332). He reportedly goes to lunch or plays pool with others once or twice a week. (Tr. 332). Plaintiff indicated that he has no problems getting along with bosses or others in authority. (Tr. 334). Consultative examiner Dr. Damari noted that Plaintiff's "manner of relating, social skills, and overall presentation were adequate," and that Plaintiff was responsive, cooperative, and made appropriate eye contact. (Tr. 510). Thus, although Plaintiff's impairments reportedly interfere with his social activity, they do not rise to the level of marked difficulties in social functioning.

As to paragraph B(3), although Plaintiff faces mild to moderate difficulties with respect to concentration, persistent, or pace, these restrictions do not satisfy the "paragraph B" criteria. As discussed above in the analysis of the treating physician rule, the treatment notes, the diagnostic tests performed by Dr. de Sanctis and the opinions of the consultative examiners support a finding that Plaintiff has no more than moderate limitations in these areas. However, a determination that Plaintiff faced marked difficulties in this functional area would nevertheless result in a failure to meet the "paragraph B" requirement, because Plaintiff would not satisfy any

of the other three criteria. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.02 ¶ B, § 12.04 ¶ B, § 12.06 ¶ B.

As to paragraph B(4), the record fails to demonstrate any episodes of decompensation for an extended duration. The record contains no evidence pertaining to a significant alteration in medication, the need for a more structured psychological support system, or any other relevant information which might suggest that Plaintiff has suffered an episode of decompensation. 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Accordingly, Plaintiff's impairments do not satisfy the "paragraph B" criteria of Listings 12.02, 12.04, or 12.06.

The evidence in the record also does not support a finding that Plaintiff's conditions meet or medically equal the "paragraph C" criteria for Listings 12.02 or 12.04. Paragraph C of these Listings calls for a

> [m]edically documented history of a chronic organic [mental or affective] disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.02 ¶ C, § 12.04 ¶ C.

As discussed above, there is no evidence of Plaintiff having suffered repeated episodes of decompensation, each of an extended duration.

Moreover, Plaintiff fails to demonstrate that he would decompensate given even a minimal change in environment or increase in mental demands (nor is there support in the record for such a conclusion). Rather, Plaintiff's environment and mental demands appear to change on a weekly basis as his son comes and goes under the shared custody arrangement. (Tr. 328). Additionally, Plaintiff's ability to drive, handle a bank account, and socialize all undermine any claim that Plaintiff is on the verge of decompensation. (Tr. 331).

Finally, there is no evidence that Plaintiff is unable to function outside a highly supportive living environment for at least one year. To the contrary, Plaintiff lives alone, except for when his son stays with him. (Tr. 328).

Paragraph C of Listing 12.06 requires a showing of a "complete inability to function independently outside the area of one's home." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.06 ¶ C . As discussed above, Plaintiff's own statements demonstrate that he is independent and takes care of his activities of daily living inside and outside of his home.

Thus, Plaintiff's mental impairments, considered in totality, do not meet or medically equal Listings 12.02, 12.04 or 12.06.

Plaintiff also makes a cursory argument that the ALJ should have sought the advice of a medical expert to determine if Plaintiff met a Listing. However, Plaintiff has not argued that he has met any particular Listing or pointed to any gap in the record that the ALJ should have developed. As discussed above, the ALJ's finding was supported by substantial evidence and in the absence of any basis for concluding that the record was not sufficiently developed, the ALJ was under no obligation to seek additional information, including testimony from a medical expert. *See Rosa v. Callahan*, 168 F.3d 72, 79, n. 5 (2d Cir. 1999) ("[W]here there are no obvious

gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information . . . .") (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir.1996)); *Rivera v. Comm'r of Social Sec.*, 15 Civ. 8439, 2017 WL 120974, at *10 (S.D.N.Y. Jan. 12, 2017) ("An ALJ is not required to consult a medical expert to determine whether a plaintiff meets a listing."), *report and recommendation adopted*, 2017 WL 946296 (S.D.N.Y. Mar. 9, 2017) (citing 20 C.F.R. § 404.1527(e)(2)(iii) (an ALJ "may . . . ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment(s) and on whether [her] impairment(s) equals the requirements of any impairment" in the Listings.)).

Accordingly, remand is not warranted for improper or inadequate analysis at step three.

## IV.     Conclusion

For the foregoing reasons, I respectfully recommend that the Commissioner's motion for judgment on the pleadings be granted and that Plaintiff's motion for summary judgment be denied.

## V.     Objections

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be addressed to the Honorable Lorna G.

Schofield, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Schofield.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS <u>WILL</u> RESULT IN A WAIVER OF OBJECTIONS AND <u>WILL</u> PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Respectfully submitted,

<u>*s/ Ona T. Wang*</u>

Dated: August 14, 2018                                     **Ona T. Wang**
       New York, New York                       United States Magistrate Judge